UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAMELA A. BOYER,

    Plaintiff,          Case No. 04-72031

vs.                DISTRICT JUDGE JOHN CORBETT O'MEARA
                MAGISTRATE JUDGE STEVEN D. PEPE
JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I. BACKGROUND**

Pamela A. Boyer brought this action under 42 U.S.C. §405(g) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Both parties have filed motions for summary judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, **IT IS RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED** and the Commissioner's motion for summary judgement **GRANTED**.

**A. Procedural History**

Plaintiff applied for DIB in October 2001, alleging that she became disabled in March 1994 due to various musculoskeletal impairments (R. 45, 51).[1] After Plaintiff's claim was

---

[1] Plaintiff's Brief incorrectly states that she filed applications for both Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") at this time. *See* Plaintiff's Brief at 3 (citing R. 34-35). Commissioner's final decision presently before this Court concerns only Plaintiff's application for DIB (R. 19). At the administrative hearing Plaintiff's counsel indicated that she might file for SSI in the future (R. 275-76), but the

initially denied (R. 35-38), a hearing was held on May 5, 2003, before Administrative Law Judge Melvyn Kalt (ALJ) (R. 250-280).  Plaintiff was represented by her current attorney, Robert MacDonald and Vocational Expert Christian R. Barrett, Ed.D., (VE) also testified (R. 276-278).

In a June 13, 2003, decision ALJ Kalt concluded that Plaintiff was not disabled prior to the expiration of her insured status because, despite her impairments, she could perform a significant number of limited light-level jobs identified by the vocational expert (R. 19-27).  On February 21, 2004, the Appeals Council denied Plaintiff's request for review (R. 9-10).

### B. **Background Facts**

#### 1. *Plaintiff's Hearing Testimony*

Plaintiff was 52 at the time of the hearing (R. 253).  Her insured status expired on December 31, 1999 (R. 252).  She finished the twelfth grade and had no other schooling or vocational training (R. 57, 254).  Plaintiff was divorced and lived alone (R. 253).  Her sole source of income was $800 a month in alimony payments, which Plaintiff indicated was scheduled to end in July 2003 (R. 274).

Plaintiff worked as a horse groom from 1984 until her alleged onset date of disability (R. 52, 70, 254).  Her responsibilities included: "taking care of a string of horses on the farm and at the track, rubbing horse, feeding, tack, feeding the farm, racing horses" (R. 254).  The jobs physical requirements included: standing, raking, cleaning stalls, rubbing and bathing the horses, and lifting objects, such as bales of hay, seven gallon water buckets and any kind of equipment used to ready the horses (e.g. tack, saddles, bridles).  She stopped working in March 1994 due to

---

administrative record does not contain an application for SSI.

injuries she incurred when a horse threw her into a wall, injuring her neck and arms (R. 255).

Following the accident, Plaintiff testified that she was unable to move her left arm, experienced headaches, neck pain and lower back problems (R. 256). Plaintiff was not hospitalized, but was under a doctor's care and was frequently absent from work. She underwent therapy, surgery on her left arm and several injections to her neck, shoulder and elbow, which helped to a certain degree (R. 257). Plaintiff took anti-inflammatory medication, including Robaxin and Naproxen, and pain medication, including Lorcet. She stopped working completely on June 18, 1997, approximately three years after the accident, because she was unable to do either regular or light work (R. 259). Plaintiff did not apply for any other jobs through the date of the hearing (R. 272).

After Plaintiff stopped working completely, she indicated that her symptoms were roughly the same if not worse. Plaintiff described constant neck pain and stiffness, pain in her left arm, elbow and shoulders, numbness in the fingers of her left hand, and difficulty holding items in her left hand (R. 259-61). In addition, Plaintiff recalled three separate occasions where her back went out and she was off her feet for six weeks each time (R. 268).[2] She said she had also begun to experience problems on her right side (R. 261-62). Her pain was aggravated by cleaning, cooking, or driving, and standing or sitting for long periods of time (R. 260).[3]

---

[2]Plaintiff reported that her low back pain also affected her left leg causing shooting pain down into her foot (R. 268-269).

[3] During her marriage, Plaintiff's husband did the grocery shopping and cooking, and paid the bills (R. 263-264). Yet, Plaintiff testified that her husband primarily did the cooking before the accident as well (R. 264). In addition, although Plaintiff claimed to have limited her activities due to her impairments, she did report reading a lot, watching television, driving and performing light household chores including cooking, laundry and shopping (R. 80-81, 265, 274).

Plaintiff reported that she is unable to push, pull or lift anything with her left arm (R. 262). She can lift 10-15 pounds with her right arm (R. 267).[4] Plaintiff could stand for an hour at best, but could never sit (R. 266). She used heating pads and showers to help alleviate her pain.

Plaintiff testified that "until [her] money ran out" she saw a psychologist for several sessions which helped her to cope with not being able to work and being alone (R. 271). She also reported difficulty sleeping, which sleeping pills failed to help.

### 2.  *Medical Evidence*

An August 11, 1994 MRI revealed a herniated cervical disc at C5-C6 (R. 179-81). George K. VanOsten, M.D., examined Plaintiff on November 7, 1994, at which time she reported neck pain radiating down her left arm and hand since she had been thrown into a wall by a horse in 1994 (R. 113-14, 189). Plaintiff had continued working following the incident. She reported taking Ibuprofen, 600mg, 3 or 4 times a day and also Lorcet Plus for breakthrough pain. Examination revealed decreased grip on the left side. Cervical motion was within normal limits, although Plaintiff complained of pain at some extremes of motion (R. 113-14). She was administered a steroidal injection. Plaintiff also reported problems sleeping and Elavil was prescribed. The following month she reported a 20% improvement following the injection, and another was administered (R. 112). Plaintiff was next seen in March 1995, when she received another injection (R. 111). Additional injections were administered in 1996 and 1997 (R. 108-10).

On November 27, 1995, Audrea H. Wynn, M.D., saw Plaintiff and described her as doing well (R. 169). Yet, over the last several weeks, the pain on the left side and radicular symptoms

---

[4] Plaintiff testified that she was ambidextrous (R. 274).

down the left arm had been coming back. She was working almost full duty except for limited use of her left arm. An epidural steroid injection was recommended. Two years later, in June 1997, Plaintiff told Dr. Wynn that it was becoming impossible for her to work, and Dr. Wynn took her off work status (R. 156, 258). Dr. Wynn administered another injection, after which Plaintiff said her elbow was great but her neck pain continued (R. 153). She was referred for a neurological evaluation.

On October 13, 1997, William A. Shabb, M.D., documented decreased grip strength and decreased adduction of her left fingers (R 108-109). He also documented decreased strength in the left elbow. Following a cervical epidural steroid injection, no complications were noted and good initial relief was obtained.

In February 1998, Richard C. Cooper, M.D., performed a neurosurgical evaluation (R. 115-16). Cervical x-rays revealed minimal motion from C4 through C6. She exhibited excellent range of motion of the cervical spine as well as normal reflexes and sensation. She had pain in her left shoulder with passive range of motion. Dr. Cooper did not recommend surgery. Instead, the following month Plaintiff began a course of physical therapy, in response to which she improved (R. 145, 149).

In March 1998, Plaintiff began physical therapy, which included moist heat followed by ultrasound and cervical range of motion exercises (R. 149). She had 8 sessions of physical therapy by April 7, 1998, which improved her condition.

On August 6, 1998, Plaintiff complained of continued problems with her hand including dropping things and difficulty lifting (R. 138). Dr. Wynn recommended an epicondylar release, which he performed in November 1998 (R. 133). On September 29, 1998, Dr. Wynn proscribed

Zoloft for stress (R. 137).

Plaintiff did well following surgery with her ranges of motion returning to normal by March 1999 (R. 124, 126). In July 1999, however, Plaintiff complained of excruciating neck pain (R. 121). Dr. Wynn recommended another neurosurgical evaluation.

In August 1999, neurosurgeon, James B. Chadduck, M.D., examined Plaintiff, at which time she demonstrated decreased grip and biceps strength on the left, but full strength on the right, and normal reflexes and gait (R. 199-200). An MRI revealed no significant changes since the December 1997 study (R. 197). An EMG revealed mild left ulnar neuropathy, but no definite evidence of carpal tunnel syndrome or cervical radiculopathy (R. 196).

In October 19, 1999, Dr. Wynn competed a form describing Plaintiff as unable to work, but not describing any specific symptoms or functional limitations (R. 119). Plaintiff's insured status for disability insurance benefits expired in December 1999.

In February 2000, Dr. Wynn informed Plaintiff's attorney that she considered her to have been totally disabled since April 1998 (R. 117). Dr. Wynn's final progress note dated February 16, 2000, describes Plaintiff as "starting to get some early symptomatology on her right side (R. 118).

In February 2000, Dr. Chadduck reported that Plaintiff was complaining of bilateral arm pain, and he recommended another epidural steroid injection (R. 193). In March, Dr. Chadduck recommended that Plaintiff remain off work until further notice (R. 190). Dr. Chadduck referred Plaintiff to Oren Sagher, M.D., on March 21, 2000, because Plaintiff was moving to Michigan (R. 191). Dr. Sagher examined Plaintiff in May 2000, and diagnosed cervical spondylosis with a significant musculoskeletal component to her pain (R. 202, 204-05).

6

He noted further that there was clinical evidence for bilateral carpel tunnel syndrome. Plaintiff exhibited a stiff neck, but normal strength and reflexes in both arms. Dr. Sagher prescribed medication, but did not recommend surgery.

On July 20, 2000, Plaintiff began treating with Melody Burt, D.O., as her family practitioner (R. 224, 228). Treatment records document that Plaintiff primarily saw Dr. Burt for routine health care including pap smears, breast examinations, and treatment for colds (R. 208-27, 231-47). Dr. Burt also prescribed medication for Plaintiff's neck and arm pain, as well as stress. On February 27, 2003, Dr. Burt completed a residual functional capacity statement (physical) describing Plaintiff as experiencing bilateral upper extremity weakness and reflex deficits, and chronic neck and upper extremity pain (R. 228-30). Dr. Burt opined that Plaintiff could sit for three out of eight hours, stand one out of eight hours, walk two of out eight hours, and would require a sit/stand option as well as an option to lie down. Dr. Burt described Plaintiff as able to lift no more than five pounds, able to occasionally grasp and do fine manipulation, extremely limited in reaching, pushing and pulling, and should never reach above shoulder level.

A state agency physician, B.D. Choi, M.D., reviewed the medical evidence of record and concluded that Plaintiff could perform light-level work as of her December 1999 date last insured (R. 100-07). He indicated that Plaintiff had no established postural limitations, could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8 hour workday, sit about 6 hours in an 8 hour workday, and was unlimited in her ability to push and/or pull.

On March 8, 2002, state agency psychologist, Rom Kriauciunas, Ph.D., concluded that there was insufficient evidence to reach a mental medical disposition (R. 86).

### 3. *Vocational Evidence*

VE Barrett described Plaintiff's past work as a "horse groomer/trainer" as semi-skilled work typically performed at a medium exertional level (R. 276). He indicated that Plaintiff had transferable skills to work performed at lessor exertional levels, including 300 horse groom jobs.

ALJ Kalt asked VE Barrett to assume he found Plaintiff's testimony to be credible in all respects regarding pain limitations. The VE stated that assuming Plaintiff's testimony was credible would preclude all competitive employment (R. 277). ALJ Kalt then asked VE Barrett to consider whether Plaintiff would be capable of performing either her past work or work to which she has transferrable skills if he were to credit Exhibit 9F, pages 1-3, which is Dr. Melody Burt's Residual Functional Capacity Statement (Physical Limitations). VE Barrett testified that these findings would preclude all competitive employment because they indicate Plaintiff is unable to sit, stand, and walk sufficiently for a significant period of time to complete a work day.

ALJ Kalt then asked VE Barrett to assume that he found Plaintiff was capable of performing work that involved lifting weight less than 10 pounds, allowed a sit/stand option, did not require the use of power tools, did not require the continuous use of her hands, or working overhead with either of her extremities. VE Barrett testified that assuming that this person could "continue through an eight hour day" and have a sit/stand option there would be a significant number of sedentary jobs that she could perform, including work as a badge checker, a gate tender, a information clerk, or security monitor (R. 278).[5]   In response to the ALJ's question, VE

---

[5] There is some confusion in the record as to the number of jobs available in the area. The hearing transcript indicates that "there would be about 40,000 such jobs, about 7 in the state" (R. 277-278). In the ALJ's decision, he states that "the vocational expert testified that given all of these factors that there exists 300 horse groomers and 4,000 badge checkers in the state, as well (sic) information clerk, and monitor jobs in the regional area with 7,000 in the State

8

Barrett testified that it was the frequency and severity of the pain Plaintiff described in focal parts of her body, requiring her to lay down the majority of the day, which would preclude her from "sustaining any type of purposeful activity sufficient to complete a workday or work week."

### 4. *The ALJ's Decision*

ALJ Kalt found that Plaintiff met the nondisability requirements of the Act and was insured for benefits through December 31, 1999 (R. 26). In addition, he found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. Plaintiff's cervical disc stenosis and bilateral epicondylitis qualified as severe impairments (R. 23). Yet, the severity of Plaintiff's conditions did not meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, of Regulations No. 4 (20 C.F.R. § 404.1520(d)) (the "Listing") (R. 26).

ALJ Kalt found that Plaintiff's allegations regarding her limitations were not fully credible because her claims of pain prior to December 31, 1999, were not substantiated by the objective medical record (R. 23-24). He noted that there were several discrepancies between Plaintiff's testimony and actions. Although Plaintiff testified she was unable to work due to the injuries she suffered in March 1994, she continued to work on and off until June 18, 1997. Plaintiff indicated that she had undergone therapy and several injections, but only for short period of times. She testified that sitting, standing and driving aggravated her neck pain and she had quit driving, but she drove to the hearing. Moreover, although requiring some assistance,

---

of Michigan" (R. 25). It is assumed that the discrepancy is simply due to typographical errors made in the hearing transcript. Regardless, no party has challenged that the VE testified that there were a substantial number of jobs available given the ALJ's hypothetical.

Plaintiff indicated that she was able to maintain her home and enjoyed reading and watching television.

ALJ Kalt stated that his decision was also based on the opinions of the state agency medical consultants and the vocational expert (R. 24). He found that the state examiners' opinions were consistent with a finding of no disability, and that nothing in the record justified a conclusion that Plaintiff's impairments were more limiting. In addition, he noted that the VE testified that, given ALJ Kalt's hypothetical, there existed a significant number of jobs Plaintiff could perform.[6]

ALJ Kalt found that Plaintiff had the following residual functional capacity (RFC): can lift a maximum of 10 pounds, can sit approximately six hours out of an eight hour day, requires a sit/stand option, and is unable to use power tools, work overhead, or use her hands continuously (R. 26). He concluded that Plaintiff was unable to perform any of her past work, but had transferable skills from semi-skilled work previously performed. Therefore, ALJ Kalt determined that Plaintiff had the residual functional capacity to perform a significant range of sedentary work and was not disabled.

## II.     ANALYSIS

### A.     Standard Of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as

---

[6] *See*, footnote #5.

"[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[7] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B. Factual Analysis

In her motion for summary judgment Plaintiff argues that ALJ Kalt erred as follows: (1.) failing to properly consider the opinions of Plaintiff's treating physicians and (2.) by forming a deficient hypothetical question.

#### 1. *Proper Use of Treating Physicians' Opinions*

---

[7] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

It is well established that the findings and opinions of treating physicians are entitled to substantial weight.  The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability is binding on the Social Security Administration as a matter of law.[8]  The administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary."  *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

Under the Social Security Administration regulations, the Commissioner will generally give more weight to the opinions of treating sources, but it sets preconditions for doing so.  20 C.F.R. §404.1527.  The regulation also limits the scope of the subject matters on which the Commissioner will give a treating source opinion greater weight.  The Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record."  20 C.F.R. § 404.1527(d)  *See also*, S.S.R. 96-2p.

The regulation also limits the subjects upon which the Commissioner must defer to a treating source opinion to "the issue[s] of the nature and severity of your impairment[s]."  20 C.F.R. § 404.1527(d)(2).  Under 20 C.F.R. § 404.1527(e), the Commissioner will not defer or provide special significance to treating source opinions on certain subjects that are "reserved to the Secretary" which includes treating physician opinions on a claimant's disability under the

---

[8]*See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

Listing, on residual functional capacity or a general and conclusory statement of disability or inability to work.

Under 20 C.F.R. § 404.1513 (b)(6) a treating source "statement about what [a claimant] can still do despite . . . impairment(s)" falls within the Commissioner's definition of "medical opinion." under §404.1527(a)(2) because "what [ a claimant] can still do despite impairment(s)" and "physical or mental restrictions" are medical judgments about the nature and severity of [a claimant's] impairment(s)."  The same logic seems to apply for the inverse, i.e. for what a claimant cannot do in light of the impairment.

Plaintiff's chief argument is that the ALJ erred by not affording sufficient weight to the opinion of her treating physician, Dr. Burt, concerning the limitations resulting from her underlying medical conditions (Dkt. #15, p. 12-15).[9]  Specifically, Dr. Burt described Plaintiff as needing to lie down at her discretion, able to reach, push or pull only on an extremely limited basis, and able to grip and manipulate only occasionally (R. 228-30).  Plaintiff contends that the ALJ was required to directly addresses Dr. Burt's findings

Plaintiff's insured status for DIB purposes expired on December 31, 1999.  Dr. Burt did not see Plaintiff until July 2000, one-half year after her insured status had expired (R. 224, 228). Moreover, Dr. Burt did not assess Plaintiff's level of functioning until February 2003, more

---

[9] Plaintiff also indicated that Dr. Wynn concluded that Plaintiff was not capable of working (R. 117, 119, 125).  Yet, Dr. Wynn's statements are largely conclusory and do not describe any functional limitations.  As such, the ALJ was not bound by Dr. Wynn's conclusions or required to give his finding of disability any special significance.  *See Cohen v. Sec'y of HHS*, 964 F.2d 524, 528 (6th Cir. 1992) ("The ALJ, however, is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.").  *See also* 20 C.F.R. § 404.1527(e)(3) ("We will not give any special significance to the source of an opinion on an issue reserved to the Commissioner").

than three years after the relevant period. *See*, 20 C.F.R. § 404.1527(d)(3) ("Supportability. The more a medical source presents *relevant* evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). Dr. Burt also did not date her opinion back to the period at issue.

Plaintiff argues, however, that Dr. Burt began treating her within six months of her insured status expiration and it is logical to conclude that her longstanding medical problems documented in other physicians' records are reflected in Dr. Burt's findings. A similar fact pattern was considered by the Sixth Circuit and they noted that reports from physicians diagnosing patients after their insured status, even shortly thereafter and based on prior medical records, are only "minimally probative."

*Siterlet v. Secretary of Health and Human Services*, 823 F.2d 918, 920 (6th Cir. 1987):

> Appellant argues that the ALJ failed to give substantial weight to the opinion of Dr. Modzinski. Appellant makes much of the fact that Dr. Modzinski was his treating physician and that he placed such significant limitations on his activities as to allow him to be considered totally disabled. He further argues that since Dr. Modzinski's conclusions are supported by those of Drs. Maxim and Crawford, these combined medical opinions should have resulted in a finding of disability under the Act. Appellant fails to mention, however, that Dr. Modzinski first saw him on November 23, 1983, almost eight months after expiration of his insured status. Appellant suffers from one or more degenerative disorders. Thus, Dr. Modzinski's report is minimally probative of his condition prior to March 31, 1983.

Because Dr. Burt saw Plaintiff only after the expiration of her insured status the ALJ was not required to give Dr. Burt's opinion significant or controlling weight. Yet, even if the opinion of a treating source is not accorded controlling weight, "an ALJ must apply certain factors – namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion

with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544-45 (6th Cir. 2004). As the ALJ noted, Dr. Burt's records document that she saw Plaintiff primarily for routine health care such as pap smears, breast examinations and colds, instead of for her musculoskeletal and neurological complaints (R. 23). 20 C.F.R. § 404.1527(d)(2)(ii) ("Nature and extent of treatment relationship. Generally, the more knowledge a treating source has *about your impairment(s)* the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories."). Moreover, Dr. Burt is a general practitioner, not a neurologist or musculoskeletal expert. 20 C.F.R. § 404.1527(d)(5) ("Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

Finally, it would appear that much of Dr. Burt's opinion was based on what Plaintiff told him, and not on any clinical or other tests or observations. *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999) (upholding ALJ's opinion which rejected a treating physician's exertional limitation finding because it was based solely on the claimant's statement to the doctor). *Flanery v. Chater,* 112 F.3d 346, 350 (8th Cir.1997)."); *Woolf v. Shalala*, 3 F.3d 1210 (8th Cir. 1993) (treating opinion rejected when based solely on the claimant's complaints of pain and unsupported by his or her findings).

While it would have been preferable for ALJ Kalt to directly discount Dr. Burt's findings of functional limitation, based on this record and the weight properly afforded Dr. Burt's

15

opinion, there is insufficient reason to remand for further findings. Accordingly, ALJ Kalt did not error in his treatment of Plaintiff's treating physicians, and his decision should be upheld.

### 2. *Hypothetical Question*

Plaintiff argues that the hypothetical question which the ALJ asked of the vocational expert and relied upon to deny benefits failed to take into consideration the extent of Plaintiff's pain, her need to lie down and the extent to which her arms and hands have been limited as documented by her treating doctors. The ALJ may pose hypothetical questions to the VE which include only those limitations which the ALJ finds credible. *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993). Plaintiff's argument for a deficient hypothetical question is supported largely by her claim that the ALJ did not properly consider the opinion of Plaintiff's treating physicians. Having found that the ALJ did not error in his handling of those opinions, there is sufficient evidence to uphold the ALJ's hypothetical question.

Plaintiff worked at an exertionally demanding job as a horse groom for several years after incurring her injury, until June 1997. A state agency physician reviewed the medical evidence of record and concluded that Plaintiff could perform light-level work as of her December 1999 date last insured (R. 100-07). Moreover, the ALJ noted that there were several discrepancies between Plaintiff's testimony and actions. In addition to working past her alleged onset date of disability, Plaintiff indicated that she had undergone therapy and several injections, but only for short period of times. She also testified that sitting, standing and driving aggravated her neck pain and she quit driving, but she drove to the hearing. It was therefore reasonable for the ALJ to limit his hypothetical question only to those limitations he found credible. Accordingly, the ALJ's decision should be upheld.

### III. RECOMMENDATION

For the reasons stated above, **IT IS RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED** and the Commissioner's motion for summary judgement **GRANTED.** The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Sec'y of Health and Human Servs., 932 F.2d 505 (6th Cir. 1991); United States v. Walters, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Willis v. Sec'y of Health and Human Servs., 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: March 29. 2007,                               s/Steven D. Pepe
Flint, Michigan                                      United States Magistrate Judge

17

CERTIFICATE OF SERVICE

      I hereby certify that on <u>March 29. 2007,</u>, I electronically filed the foregoing paper with the Clerk  Court using the ECF system which will send electronic notification to the following:<u>Janet L. Parker, AUSA, Robert J. MacDonald, Esq.,</u>  and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: <u>Social Security Administration - Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, IL 60606</u>

                                             <u>s/ James P. Peltier</u>
                                             James P. Peltier
                                             Courtroom Deputy Clerk
                                             U.S. District Court
                                             600 Church St.
                                             Flint, MI 48502
                                             810-341-7850